**UNITED STATES of America**

v.

**FURST, Sidney D., Appellant.**

**No. 89–5294.**

United States Court of Appeals, Third Circuit.

Argued Aug. 10, 1989.

Decided Sept. 22, 1989.

Rehearing and Rehearing In Banc Denied Nov. 2, 1989.

---

Robert L. Potter (argued), Frank Arcuri, Strassburger, McKenna, Gutnick & Potter, Pittsburgh, Pa., for appellant.

James J. West, U.S. Atty., Scranton, Pa., Wayne P. Samuelson (argued), Asst. U.S. Atty., Lewisburg, Pa., for appellee.

Before SLOVITER and GREENBERG, Circuit Judges, and VAN ANTWERPEN, District Judge.*

* Honorable Franklin S. Van Antwerpen, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

Sidney D. Furst appeals from his conviction on multiple counts of theft from pension funds, making false statements in bank records, and making false statements in reports required by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* He contends that his motion at trial for a judgment of acquittal should have been granted and that, alternatively, because of trial errors he should be granted a new trial. He also appeals from the refusal of the district judge to disqualify himself from imposing sentence pursuant to these convictions.

We will reverse the convictions on the theft from pension fund counts and one of the three counts relating to false statements in ERISA records, and direct Furst's acquittal on those counts, but will affirm the convictions on the other counts. We will vacate the sentences imposed on the remaining counts and will remand this matter to the district court for reassignment to a different district judge for imposing a new sentence.

## I. BACKGROUND

### A. *Underlying Facts*

Furst was employed as a Vice President in the trust division of Northern Central Bank (NC Bank) in Williamsport, Pennsylvania, and in this capacity was responsible for investments for a number of trust accounts. Furst had a nationwide reputation in the investment community for his ability to select venture stocks.

In late 1979, Furst began investing the funds of some of the accounts which he oversaw with First Commodities Corporation of Boston (FCCB) and by the fall of 1980, $909,100.00 had been so invested. *See* Trial Transcript of Jan. 10, 1989, at 125 (testimony of M. Aderhold). Some of these funds were those of the Williamsport Orthopedic Association Defined Benefit Plan (WOA)[1] and the Williamsport Foundation

1. Of the total investment in FCCB, $481,500.00 was from the WOA account. *See* Trial Transcript of Jan. 11, 1989, at 29 (testimony of M. Aderhold). It appears from NC Bank's records

(WF).[2]

As of the fall of 1980, FCCB statements indicated that a very large portion of the funds invested had been lost. At the end of December, 1980, FCCB transferred the remaining sum, $236,015.52, to First Financial Corporation of Miami (FFCM), also identified as First Financial Corporation of America (FFCA).

On August 26, 1981, FFCM sent three checks for $307.10, $256.85 and $269.65 to NC Bank. *See* Trial Transcript of Jan. 10, 1989, at 132–34 (testimony of M. Aderhold); Trial Transcript of Jan. 11, 1989, at 20 (testimony of M. Aderhold). Although there is no evidence that the checks so indicated, *see* Trial Transcript of Jan. 11, 1989, at 119–20 (testimony of M. Aderhold), it appears that they represented the last remains of the $909,100.00 investment. *See* Trial Transcript of Jan. 10, 1989, at 133–34, 141–42, 166–67, 169, 170 (testimony of M. Aderhold); Trial Transcript of Jan. 11, 1989, at 20 (testimony of M. Aderhold).

In October, 1981, Furst directed that an entry be made in the NC Bank computer closing out the WOA investment in FCCB/FFCM for $180,000.00. Thereafter, as Furst explains in his brief:

> In Spring, 1982, NC Bank's Trust Division had not received the $180,000 which had been booked as a receivable on the close out of WOA's investment in FCCB in October, 1981. A computer transaction was entered eliminating the receivable, debiting cash, and creating a deficit in the WOA account of $180,000.

Brief for appellant at 6.

In the 1983 WOA annual report Furst represented that FCCB/FFCM owed the fund $180,000.00. Thereafter, in the 1984 annual report Furst represented that the $180,000.00 was uncollected but was earning interest so that the total sum due was $220,617.67.

On February 14 or 15, 1985, an account captioned the WOA Escrow account was created in NC Bank's computer system and was opened with a balance of $0.00. *See* Appellee's app. at 382–84; Trial Transcript of Jan. 10, 1989, at 56 (testimony of M. Aderhold); Trial Transcript of Jan. 11, 1989, at 62 (testimony of M. Aderhold).

In a memorandum dated February 21, 1985, Richard Neidig, an employee of NC Bank who reported to Furst, sent revised schedules of assets of WOA for use in WOA's annual report for the period ending October 31, 1984. *See* Gov't Ex. 165. The attached schedule of assets and portfolio summary both indicated: "The above market value does *not* include $220,617.67 being held in the W.O.A., Inc. Pension Escrow account," *id.*, the account which had just been opened the week before with no balance.

In September 25, 1985, Furst engaged in a three-step transaction to sell stock held by another account he controlled, Stock Bond Fund 501C, to an ERISA account, Stock Fund Number 2, he also controlled.[3] *See* Trial Transcript of Jan. 10, 1989, at 54, 55, 57 (testimony of M. Aderhold). The stock involved was a venture capital stock in the Machine Vision Company. By buying the stock from the first account at a lower price than he sold it to the third account,[4] Furst generated $240,000.00 in

---

**2.** Furst was not charged with any wrongdoing in making these investments for either WOA or WF.

that the orders placed by NC Bank for WOA's investment in FCCB was made at the customer's request. *See* Trial Transcript of Jan. 11, 1989, at 86 (testimony of M. Aderhold).

At trial the defense argued that Dr. Fred R. Amsler, one of WOA's trustees, had requested this particular investment. *See id.* at 86–87. The defense also drew out the fact that the FCCB customer agreement, dated May, 1980, indicated that Dr. Amsler was related to Stanley J. Weiner, the FCCB broker. *See id.* at 112–14. Amsler denied directing the investment. *See* Brief for appellant at 5 n. 6.

**3.** It is undisputed that Furst had the authority to make such transactions between accounts as to which he was a common trustee.

**4.** The first account, Stock Bond Fund 501C, had purchased the Machine Vision stock at $1.75 per share. *See* Trial Transcript of Jan. 11, 1989, at 65–66 (testimony of M. Aderhold). This account received $2.00 per share from the second account, WOA Escrow, *see* Trial Transcript of Jan. 10, 1989, at 54, 57, 58–59 (testimony of M. Aderhold), representing the original purchase

the second account, the WOA Escrow account, through which the trades were implemented. This was the first positive balance the WOA Escrow account had since it was opened on or about February 14, 1985. *See* Appellee's app. at 383–85; Trial Transcript of Jan. 10, 1989, at 56–57 (testimony of M. Aderhold).

On September 30, 1985, the sum so generated was distributed to WOA, one of the accounts that had lost money as a result of the FCCB/FFCM investment. *See* Trial Transcript of Jan. 10, 1989, at 57–60 (testimony of M. Aderhold); Trial Transcript of Jan. 11, 1989, at 19–20, 30, 81–82 (testimony of M. Aderhold).[5]

On October 31, 1985, WOA's fiscal year ended and its annual report reflected the receipt of $240,000.00. However, instead of indicating that this sum was attributable to the gains generated through the Machine Vision trade, the report represented that the $240,000.00 was the $220,617.67

account receivable due from FCCB/FFCM listed in the 1984 annual report together with interest.

In the fall of 1985, Furst and another NC Bank employee, Marshall Raucci, were negotiating with Guarantee Bancshares (GB) about leaving NC Bank to open a trust company for GB. In December, 1985, Furst and Raucci met with GB's officers and GB's attorney, David W. Marston, to discuss how Furst and Raucci should conduct themselves during the interim period before they left NC Bank.

On December 26, 1985, Furst conducted a second internal stock trade through accounts he controlled, this one involving stock in the Rocking Horse Child Care Center. Like the earlier trade this transaction used different rates for the two sales,[6] thus generating a sum that was distributed to WF, one of the other accounts that had lost money as a result of the FCCB/FFCM investment.[7] As in the case of the Machine

price plus a market rate of interest from the date of purchase. The third account, Stock Fund Number 2, bought the Machine Vision Stock at $4.40 per share. *See id.* at 55, 57, 58–59; Trial Transcript of Jan. 11, 1989, at 70 (testimony of M. Aderhold). Although at the time of this internal stock trade the Machine Vision stock was restricted so that it was not saleable on the open market, comparable unrestricted stock in Machine Vision was trading at $6.00 per share at the time of this transaction. *See* Trial Transcript of Jan. 11, 1989, at 70–71 (testimony of M. Aderhold).

As a result of the Machine Vision transactions, WOA Escrow gained $240,000.00. *See* Trial Transcript of Jan. 10, 1989, at 57–59 (testimony of M. Aderhold).

5. The government produced testimony that, in fact, the only portion of WOA's $481,500.00 investment in FCCB ever recovered was $2,700.00. *See* Trial Transcript of Jan. 11, 1989, at 29 (testimony of M. Aderhold). But the same witness indicated that WOA had received two checks dated March 12, 1981, in the amounts of $7,472.06 and $9,436.36. *See id.* at 115 (discussing Gov't Ex. 78).

Although the March 12, 1981, checks did not provide any explanation, when they were entered into the NC Bank computer system they were coded as a termination of the FCCB investment. *See id.* at 115–19.

6. The first account, Stock Bond Fund A, owned Rocking Horse stock. This account received $3.25 per share from the second account, WOA Escrow, *see* Trial Transcript of Jan. 10, 1989, at 61–62 (testimony of M. Aderhold); Trial Tran-

script of Jan. 11, 1989, at 72 (testimony of M. Aderhold), representing the original purchase price plus a market rate of interest from the date of purchase. Stock Fund B and Stock Fund 1 bought the Rocking Horse stock at $4.35 per share. *See* Trial Transcript of Jan. 10, 1989, at 62 (testimony of M. Aderhold); Trial Transcript of Jan. 11, 1989, at 76 (testimony of M. Aderhold). Although at the time of this internal stock trade the Rocking Horse stock was restricted so that it was not saleable on the open market, comparable unrestricted stock in Rocking Horse was trading at above $4.35 per share at the time of this transaction. *See* Trial Transcript of Jan. 11, 1989, at 76 (testimony of M. Aderhold).

As a result of the Rocking Horse transactions, WOA Escrow gained approximately $291,000.00. *See* Trial Transcript of Jan. 10, 1989, at 65 (testimony of M. Aderhold).

7. On December 27, 1985, $291,133.70 of the sum generated in WOA Escrow was transferred to three WF accounts. *See* Trial Transcript of Jan. 10, 1989, at 63–65 (testimony of M. Aderhold). The explanation, with slight variations in two instances, accompanying each of these distributions was that the transfer reflected "proceeds from termination of First Commodity Corp. multiple futures contracts program 2." *See id.* at 70–71 (testimony of M. Aderhold); *see also* Trial Transcript of Jan. 11, 1989, at 20–23, 30–35, 82 (testimony of M. Aderhold).

The WF–Waldron account numbered 71093–50–4 received $107,719.47 and a second transfer of $104,808.13, the WF–Graham account num-

Vision transaction, the second transfer of the Rocking Horse shares was to ERISA accounts. Neidig facilitated this internal stock trade and the distribution of the proceeds.

In April, 1986, Furst and Raucci left NC Bank and established Guarantee Trust Company in Williamsport, Pennsylvania, for GB. In October, 1986, as allegations of misconduct by Furst in his position at NC Bank began to surface, officers of GB requested that he attend a meeting in Philadelphia to explain the situation. The meeting was attended by William Dimeling, GB's chairman, *see* appellee's app. at 649, Marston, GB's attorney who arrived after the meeting started, Furst, and Richard East. *See* appellee's app. at 649, 666–67, 681 (listing those present as Furst, Dimeling, Marston, and East); Gov't Ex. 175 (same).

East was an officer of Tobias Knoblauch Private Bank, a bank not affiliated with GB, but in which GB's chairman, Dimeling had an interest. It appears that Dimeling asked that East be present because East had actually heard the specific allegations of misconduct. *See* appellee's app. at 667.

At the October, 1986, meeting Furst related most of the foregoing facts to those present. Furst allegedly explained that he was aware of three potential areas in which his conduct at NC Bank may have been questioned. First, he had distributed the proceeds of a class action settlement into the trust department's operating funds rather than to specific beneficiaries. Second, he had traded in his mother's account, an activity for which he had been criticized at NC Bank. He indicated, however, that inasmuch as he had her permission he did not think this presented any real problem. Third, Furst explained that "he had invested in some gold commodities on behalf of a couple investment funds in the early eighties and had sustained substantial losses and had used other trades subsequently to 1980 to try to make good the losses in those accounts." Appellee's app. at 685–86. This third area of potential difficulty

related to the Machine Vision and Rocking Horse transactions.

With respect to this third area, Furst allegedly explained that the commodities had declined in value by $700,000.00 shortly after the investment. *See* appellee's app. at 686. Moreover, Furst supposedly admitted that he carried the commodities investment on the books at the value of the original investment so that the investors were unaware of the loss. *See* appellee's app. at 687. And Furst allegedly explained that he used profits generated from internal bank trades to make up the commodities loss. *See* appellee's app. at 687–88. Furst allegedly conceded that if a subordinate had engaged in these transactions and it came to his attention, Furst would have been forced to terminate him. *See* appellee's app. at 690–91.

At the end of this meeting Marston suggested that Furst should obtain independent legal representation.

## B. *The Development of This Litigation*

On August 26, 1988, a federal grand jury for the Middle District of Pennsylvania returned a twenty-eight count indictment against Furst including allegations of bank fraud, theft from pension funds, making false statements in bank records, misapplication of bank funds, and making false statements in reports required by ERISA.

A jury trial commenced on January 9, 1989. At the close of the government's case the district court dismissed counts XII through XVII and XX on Furst's motion for acquittal but otherwise denied that motion. Furst unsuccessfully renewed his motion for acquittal on the remaining counts at the end of the presentation of all the evidence. On January 27, 1989, the jury returned a verdict of guilty on counts III and IV, which had charged embezzlement from pension funds, counts V through VII, which had charged making false statements in bank records, and counts IX through XI, which had charged making false statements in ERISA doc-

---

bered 71088–83–5 received $17,468.02, and the WF–Snowden account numbered 71089–98–1 re-

ceived $61,138.08. *See* Trial Transcript of Jan. 10, 1989, at 63–64 (testimony of M. Aderhold).

uments. The jury reached no verdict on the remaining counts.

On March 20, 1989, notice of sentencing was mailed to Furst and on April 3, 1989, Furst filed a motion to disqualify [8] Judge Kosik, who had presided over Furst's trial, from participating in his sentencing. *See* brief for appellant at 19. This motion was based exclusively on 28 U.S.C. § 455. This motion and the accompanying affidavit of Robert L. Potter, Furst's attorney, asserted that the district judge had engaged in *ex parte* communications during the course of the trial and that during these discussions, the judge had attempted to encourage a plea bargain and had made comments regarding the likelihood of enhanced sentences should the case be tried and result in a guilty verdict. *See* brief for appellant at 19. The motion concluded with the statement that "Furst has reasonable ground to question whether Judge Kosik would be willing to follow the law and act in an unbiased and impartial manner at sentencing." Appellant's app. at 793.

On April 6, 1989, the district court filed a memorandum opinion denying the motion without hearing, primarily on the ground that it was untimely. *See* appellant's app. at 819. The following day, Furst was sentenced to five year concurrent terms of imprisonment on each count and was required to make restitution of $358,757.50. Immediately following the imposition of sentence, the government filed a motion pursuant to Fed.R.Crim.P. 48(a) to dismiss without prejudice the counts of the indictment not previously dismissed and on which no verdict was returned and the court granted the government's motion. On April 7, 1989, Furst filed his timely notice of appeal and moved for release pending appeal. The district court denied the motion but on April 21, 1989, we granted Furst's motion.

We have jurisdiction under 28 U.S.C. § 1291. The district court had subject matter jurisdiction under 18 U.S.C. § 3231 inasmuch as each of the counts of the indictment charged Furst with violation of federal criminal laws.

## II. GROUNDS FOR ACQUITTAL

### A. *The Embezzlement Charges*

■ In counts III and IV of the indictment Furst was charged with violations of 18 U.S.C. § 664 which provides that:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or the use of another, any moneys, funds, securities, premiums, credits, property or other assets of any Employee Welfare Benefit Plan or Employee Benefit Plan [is guilty of a crime].

It is indisputable that one substantive element of 18 U.S.C. § 664 is that the account from which funds are embezzled must be one of the two types of accounts defined in the statute; if the account is not governed by ERISA, section 664 is inapposite. Consequently, if the government did not produce evidence from which the jury could conclude that the account from which funds were embezzled was an ERISA account, Furst's motion for acquittal on the section 644 charges should have been granted.

Our standard of review is whether the record, when viewed in the light most favorable to the government, contains "substantial evidence" to support the jury's determination of guilt. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Aguilar*, 843 F.2d 155, 157 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988).

The stock transactions which formed the basis for these counts were made in three steps. In step 1 appreciated stock was removed from a non-ERISA account and placed in a second account, WOA Escrow, in return for which the non-ERISA account was to be paid the price for which it had purchased the stock and market interest on that sum. Thus, in step 1 the portion of the stock's value that reflected apprecia-

---

**8.** The motion appears at appellant's app. at 789–94. The accompanying affidavit of Robert L. Potter, Furst's attorney, appears at appellant's app. at 796–800.

tion over market interest was removed from the non-ERISA account without compensation. The indictment, however, did not charge Furst with any crime with respect to the non-ERISA accounts and any wrongful acts of Furst as to those counts would not constitute a violation of 18 U.S.C. § 644.

In step 2 Furst caused an ERISA account to purchase the appreciated stock in Machine Vision or Rocking Horse then held by the second account, WOA Escrow, and the consideration was paid into the second account. The purchase price did not exceed the price at which stock in those companies then publicly traded, although it was significantly in excess of the price at which the non-ERISA account had sold the stock to WOA Escrow in step 1.

In step 3 the second account made good its obligation to the non-ERISA account in step 1 and the balance of funds, representing the appreciation in the stock which was removed from the non-ERISA account without compensation, was disbursed to accounts in which Furst had made the FCCB/FFCM investments which had gone bad.

The government's theory charges that the purchase by the ERISA accounts in step 2 depleted the ERISA funds. However, this theory is dependent on evidence that the ERISA accounts paid a price in excess of the market value of the stock and without such proof Furst's conviction under 18 U.S.C. § 644 cannot be affirmed.

The government asserts that there is evidence that the Machine Vision and Rocking Horse stock had a lower value than claimed by Furst and that the ERISA accounts were accordingly overcharged. The first basis of this argument is the observation that the Machine Vision stock purchased in step 1 at $2.00 per share was sold the same day in step 2 at $4.40 per share, that the Rocking Horse stock purchased in step 1

for $3.25 per share was sold the same day in step 2 at $4.35 per share, and that the WOA Escrow account was used as a "sham intermediary" for these transactions. *See* brief for appellee at 31. The second basis of this argument is that the market values asserted by Furst reflect the value of unrestricted stock, that is, stock as to which there was no restriction on sale, while the stock subject to these transactions was severely restricted, although it apparently could be internally traded by NC Bank. The government argues that unrestricted stock is worth more than restricted stock.[9]

The problem with the first observation is that we have no basis to assume that the ERISA accounts were overcharged, for it may well be that instead the non-ERISA accounts were underpaid. Consequently, the government theory relying on the alleged overcharges in step 2 requires some proof of value to demonstrate the overcharge in addition to the difference in stock prices, so that Furst would not be convicted of an overcharge in step 2 simply because the government had made out a case for under-compensation in step 1. There was no such proof.

The problem with the government's second argument that the ERISA funds were depleted is that the government does not contend that it produced any testimony regarding the specific relationship of the market value of restricted and unrestricted stock in Machine Vision and Rocking Horse so that reasonable conclusions could be reached as to the discount from market value to be taken in valuing restricted stock.

The government bears the burden of proof on each and every substantive element of a criminal offense. While the government may contest the values Furst associated with the stock which formed the subject of these transfers, it had the burden of affirmatively establishing that the

---

**9.** It would appear to be clear that a fully liquid stock would have a higher value than an identical but less liquid stock. Nonetheless, this generalization does not indicate the scope of the differential and so, standing alone, economic theory does not necessarily predict any *significant* difference in value for the stocks in issue.

We also point out that it is not clear that the ERISA accounts paid a value equal to the unrestricted value of the Machine Vision and Rocking Horse stock, *see supra*, footnotes 4 and 6, though our analysis would not be changed if they did.

value of the stock was below that which Furst caused the ERISA accounts to pay for it. When the government's prosecution under 18 U.S.C. § 664 arises in the context of a sale of property, the government accordingly bears the burden of producing evidence that the property was worth less than the ERISA accounts paid.

The government did not meet its burden of proof in this case. Consequently, though the transactions are certainly disturbing, Furst's motion for acquittal should have been granted on counts III and IV and we will reverse his conviction on those counts and remand for entry of a judgment of acquittal on them.[10]

### B. *The Bank Record Charges*

 Counts V, VI, and VII of the indictment charged Furst with making false statements in bank records in violation of 18 U.S.C. § 1005. The relevant portion of this section provides that: "Whoever makes any false entry in any book, report, or statement of [any subject bank] with intent to injure or defraud such bank, or any other company, body politic or corporate [is guilty of a crime]."

The allegedly false statements related to the distribution of the proceeds from one of the two sales between accounts that constituted the subject of the embezzlement charges.[11] Specifically, each of the three counts relates to a similar statement in three different accounts accompanying the distribution of the December, 1985, gain generated in the Rocking Horse trades. Counts V, VI, and VII related to the WF–Waldron account numbered 71093–50–4, the WF–Graham account numbered 71088–

83–5, and the WF–Snowden account numbered 71089–98–1, respectively. *See supra* note 7.

In particular, Furst is charged with having represented that the funds generated from the internal stock trades which he distributed to accounts that had invested in FCCB/FFCM were in fact returns from the FCCB/FFCM investment. With respect to these counts Furst contends that the district court erred in failing to acquit him as a matter of law.

Our standard of review is whether the record, when viewed in the light most favorable to the government, contains "substantial evidence" to support the jury's determination of guilt. *See Glasser v. United States*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Aguilar*, 843 F.2d at 157.

On December 26, 1985, Furst traded Rocking Horse shares from one fund he controlled, Stock Fund A, to the WOA Escrow account at $3.25 per share, a price reflecting the original purchase price with market interest from the date of purchase. Furst then traded the shares from WOA Escrow to Stock Funds 1 and B at $4.35 per share. Furst then distributed $291,133.70 of the gain generated in WOA Escrow by virtue of the difference in the prices to other accounts within the Williamsport Foundation (WF) over which he also had investment control.[12]

The distribution of the $291,133.70 gain was actually made by Neidig, an NC Bank employee, who reported to Furst. At trial the government's theory of counts V, VI and VII was that "[a]lthough Furst himself did not actually print false statements, he

---

**10.** We note that Furst asserts two trial errors in addition to those discussed below. These relate to the admission of evidence as to Furst's financial need as the motive for his alleged embezzlement and to the court's failure to charge the jury that under Pennsylvania trust law Furst had the authority to engage in stock trades between accounts as to which he was a common trustee. Of the convictions on appeal, only the convictions on counts III and IV could have been affected by these two asserted errors, for the Pennsylvania law of trusts is immaterial to the falsification of records issues and Furst's alleged need for funds would not explain why he would falsify records in a way which would

bring him no gain. Thus, as we conclude that Furst must be acquitted on counts III and IV, any error with respect to the evidence of financial need and the failure to charge the jury as to Pennsylvania trust law is moot.

**11.** The other internal trade, involving the Machine Vision stock, is not relevant to these three counts.

**12.** These accounts in WF are those which Furst had invested in FCCB. Thus Furst was generating gains which were then distributed to cover the bad investment in FCCB.

*caused* the offenses to be committed by his administrative assistant, Mr. Neidig." Brief of appellee at 40–41.

It is undisputed that Neidig, not Furst, completed the paperwork and various trading tickets and forms involved in the two transactions. Neidig handwrote a memorandum in which he instructed the operations department of the trust division to make cash transfers from the WOA Escrow account to the various WF accounts with the following explanation: "Proceeds from termination of First Commodity Corp. Multiple Futures Commodities Program # 2." [13] The explanation of the source of the funds constituted a false statement in violation of 18 U.S.C. § 1005.

Thus, the question presented is whether Furst caused Neidig to make this false statement. Neidig testified that although Furst did not provide all the language used in the false report, Furst explained the transaction to Neidig and Neidig drafted the language based on that understanding. *See* appellant's app. at 325–26, 330–31, 333–34, 375. Neidig further testified that the use of the language that falsely reported the source of the funds was "not entirely" his, *id.* at 377, and some portion was provided by Furst, because Neidig was not familiar with commodity securities, and "didn't know what a termination contract probably would have been at the time." *Id.* Finally, Neidig stated that "the concept behind those transactions and the wording of them came as a result of the conversation [he had with Furst] regarding the trades." *Id.* at 384.

Viewing the evidence in the light most favorable to the government, it does not appear that the district court erred in allowing this issue to go to the jury inasmuch as the jury could have concluded that, as Neidig testified, Furst caused the false statements to be made by explaining that the transactions represented the closing of the FCCB/FFCM investments. Thus, the district court did not err in failing to acquit Furst of these charges.

## C. The ERISA Record Charges

Counts IX, X, and XI charged Furst with making false statements in ERISA records for three different years in violation of 18 U.S.C. § 1027. This section states:

> Whoever, in any document required by the title I of the Employee Retirement Income Security Act of 1974 ... to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be certified [is guilty of a crime].

On its face section 1027 requires proof that: (1) the defendant made a false statement; (2) the defendant made the statement knowing it to be false; and, (3) the false statement was in a document required by ERISA. *See United States v. Martorano*, 767 F.2d 63 (3d Cir.) (per curiam), *cert. denied*, 474 U.S. 949, 106 S.Ct. 348, 88 L.Ed.2d 296 (1985); *see also United States v. S & Vee Cartage Co., Inc.*, 704 F.2d 914 (6th Cir.), *cert. denied*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983).

Without conceding that the statements in the ERISA documents were false, Furst contends that the government failed to meet its burden of proof on the element that Furst made the statements knowing them to be false. Thus, he asserts that the district court erred in failing to acquit him as a matter of law. Once again our standard of review is whether the record, when viewed in the light most favorable to the government, contains "substantial evidence" to support the jury's determination of guilt. *See Glasser v. United States*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Aguilar*, 843 F.2d at 157.

■ The three counts refer to statements in the WOA annual reports in 1983,

---

**13.** There were immaterial variations from the quoted memorandum for two of the accounts.

1984, and 1985, as to the value and status of the FCCB/FFCM investments. In 1983 Furst reported that FCCB/FFCM owed a $180,000.00 receivable to WOA. In 1984 Furst represented that the receivable was held in the WOA Escrow Account and that it had earned interest and was then worth $220,617.67. In the 1985 WOA annual report Furst represented that WOA had received $240,000.00, representing the $220,617.67 held in escrow the year before together with interest on that sum. *See* brief for appellant at 6. While these statements were made by Furst and were undoubtedly false, for the government to have proven a violation of 18 U.S.C. § 1027, it must have demonstrated that Furst knew the statements to be false. *Cf. United States v. Santiago*, 528 F.2d 1130, 1134 (2d Cir.) (decided under 18 U.S.C. § 1027 prior to its amendment to its current form), *cert. denied*, 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976).

The government lists three pieces of evidence which it introduced on the issue of Furst's knowledge that the ERISA statements were false. First, the government relied on Marston's testimony that Furst had admitted that he knew he was "locked in with a $700,000.00 loss, a short time after he made the investments ... (in) either 1980 or 1981." Brief of appellee at 50; *see* appellee's app. at 686. Assuming this to be true, inasmuch as Furst had invested a total of $909,100.00, his admission to Marston does not undermine his statement that the investment had a remaining value of $180,000.00.

The second and third pieces of evidence relate to the FCCB/FFCM statements. It is important to note that Margarethe Aderhold, the bank employee who prepared the summaries of these statements, testified that the FCCB statements found in the bank's files did not extend past the fall of 1980, and that the bank had no statements from FFCM or FFCA. *See* appellant's app. at 294–301. Even as late as December, 1980, FCCB reported that the investment had a value of $236,025.52, when it transferred the investment to FFCM. Thus, on the basis of the documents actually found in the bank files, Furst would not have

known that the investment was worth less than the $180,000.00 figure he represented.

In addition, the government relied on Ms. Aderhold's testimony that Furst's handwriting was on some of the early FCCB statements which were found in the bank files. Appellee's app. at 235. But, this cannot support an inference that Furst knew the $909,100.00 invested had fallen in value below $236,025.52.

Finally, the government relied on the testimony of Sharon Baxter, a bank employee, that she saw FCCB statements on Furst's desk "[i]n the early eighties." Appellee's app. at 309–10. But inasmuch as Baxter was not asked to be any more specific in her response, it is possible that the period to which she referred was from 1979 through the fall of 1980, at which time the FCCB statements did not indicate that the investment was worth anything less than $236,025.52.

Baxter's testimony is the only evidence that even permits an inference that Furst knew the status of the FCCB/FFCM investment at any time after the fall of 1980. But standing alone it is simply too indefinite and vague to be regarded as evidence sufficiently substantial to support Furst's conviction for having misrepresented that the value of the FCCB/FFCM investments was $180,000.00 in the 1983 WOA annual report. Therefore, even though as a matter of conjecture it is difficult to believe that Furst, as an experienced trust officer, did not know the status of the FCCB/FFCM investments when the WOA 1983 report was prepared, we conclude that the district court erred in failing to acquit Furst of count IX, relating to that report, as a matter of law.

█ The convictions on the counts relating to the 1984 and 1985 annual reports, however, stand on a different basis, inasmuch as our review of the record satisfies us that the government produced additional evidence at trial that permitted the jury to infer that Furst had knowledge that the statements in those years were false.

In the documents accompanying Neidig's February 21, 1985, memorandum for use in

WOA's 1984 annual report,[14] it was represented that the $220,617.67 remainder of the FCCB/FFCM investment was held in the WOA Escrow account. In fact, as NC Bank's own records reflect, the WOA Escrow Account did not have a positive balance at any time from its creation on February 14 or 15, 1985, until the September, 1985, Machine Vision trade. The jury could infer that Furst had knowledge of NC Bank's own records. Thus, the district court did not err in allowing count X to go to the jury.

Similarly, the district court did not err in not acquitting Furst of count XI, relating to WOA's 1985 annual report. It was clear from NC bank's own records that the $240,000.00 received by WOA was not the return of capital invested in FCCB/FFCM. The bank's records indicate that the $240,000.00 was generated in the September, 1985, Machine Vision trade.

Consequently, we will reverse Furst's conviction on count IX and remand for entry of a judgment of acquittal on that charge, but we conclude that the district court did not err in denying Furst's motion for acquittal on counts X and XI.

## III. GROUNDS FOR A NEW TRIAL

Although Furst asserts in this appeal that the district court erred in five evidentiary rulings,[15] in view of our foregoing analysis we need consider these issues only to the extent that they affected Furst's conviction on counts V, VI, VII, X, and XI. Two of the asserted errors concern the admissibility of evidence offered by the government. Specifically Furst argues that the FCCB/FFCM statements were inadmissible hearsay and that Marston's testimony was inadmissible by reason of Furst's attorney-client privilege. Two of the asserted errors relate to the scope of cross examination. Furst maintains that his cross examination of one government witness, Richard Neidig, was improperly

limited. Furst also argues that the government's cross examination of Furst's character witnesses was not as limited as required. Finally, Furst argues that the district court improperly failed to admit evidence he offered as admissions of the United States in the form of an administrative complaint and grand jury indictment of FCCB/FFCM. We will consider these asserted trial errors in turn.

### A. The FCCB/FFCM Statements

In considering the hearsay problem presented on this appeal it is necessary to review the relevant business entities and their relation to the records admitted into evidence. Furst was employed by NC Bank—one business entity—and in that capacity directed the investment of certain funds held by NC Bank to FCCB which subsequently transferred the investment to FFCM/FFCA. For purposes of this appeal FCCB, FFCM, and FFCA may be viewed as a single enterprise—the second business entity. Computer Information Service (CIS), which was acquired in 1983 by Automated Data Processing (ADP)—is the third business entity. FCCB/FFCM electronically transmitted data daily to CIS/ADP. CIS/ADP processed raw data and generated daily and monthly statements and reports for FCCB/FFCM based exclusively on the input from FCCB/FFCM.

At trial the government introduced statements and reports of FCCB/FFCM for the truth of their contents, some obtained from the files of NC Bank and others secured from other sources.

To provide a foundation for the statements and reports of FCCB/FFCM the government called two witnesses. James Burns, an employee of CIS/ADP, testified that the reports were generated by CIS/ADP's data processing software, but disclaimed any knowledge of the accuracy of the data supplied by FCCB/FFCM. On direct examination Burns testified that CIS/ADP had no direct contact with

---

14. WOA operated on a fiscal year ending October 31. Consequently, the 1984 annual report covered the fiscal year ending October 31, 1984. According to the benefits consulting firm that prepared the report, the filing deadline for the 1984 annual report was May 31, 1985.

15. Two additional issues are moot. *See supra* note 10.

FCCB/FFCM's clients, *see* Trial Transcript of Jan. 10, 1989, at 22, and that CIS/ADP did not have copies of the records which the government sought to introduce. *See id.* at 23–24.

On cross examination Burns specifically limited himself to "vouch[ing] for the accuracy of the processing." *Id.* at 26. Burns answered affirmatively the question: "[Y]ou don't vouch for what you produce because it's only as good as the information that [FCCB/FFCM] gave you?" *Id.* at 27. Moreover, Burns acknowledged that the data sent back to FCCB/FFCM could be altered before being printed out in the reports sent to FCCB/FFCM's clients. *See id.* at 31–32. Burns conceded that he had no personal knowledge of FCCB/FFCM's personnel, *see id.* at 28, no personal knowledge of whether FCCB/FFCM was "conducting [its] business in an ethical or legal manner," *id.*, and, most significantly, no personal knowledge that the commodity trades reported by FCCB/FFCM had actually occurred. *See id.* at 34–35.

The second witness was Margarethe Aderhold, an employee of NC Bank. Aderhold testified that some of the records covering the period prior to December, 1980, *see* Trial Transcript of Jan. 11, 1989, at 89–90, 92–93, were in the possession of NC Bank. *See* Trial Transcript of Jan. 10, 1989, at 82–85. She also testified that the FCCB/FFCM records matched records of the NC Bank as to the date and sums of transfers between NC Bank and FCCB/FFCM. *See, e.g., id.* at 132–34.

On cross examination Aderhold conceded that, based on NC Bank records, she had independent knowledge as to the accuracy of the FCCB/FFCM records only "to the extent they reflect the arrival of money from NC Bank," Trial Transcript of Jan. 11, 1989, at 96, and "to the extent they

indicate money being sent back to NC Bank," *id.; see also id.* at 163–65.

Furst objected to the admission of these records in a pre-trial motion filed December 22, 1988, and again at trial, *see, e.g., id.* at 85–94, 101, 109, 113, 124, 129–30, 167, on the basis that they were hearsay.[16] The government asserts that the records were properly admitted under either the business record exception to the hearsay rule, Fed.R.Evid. 803(6), or under the residual exception to the hearsay rule, Fed.R.Evid. 803(24). The exceptions require independent analysis.

To the extent that the district court's admission of these documents was based on an interpretation of the Federal Rules of Evidence, we exercise plenary review, *see In re Japanese Electronic Products Litigation,* 723 F.2d 238, 265 (1983), *rev'd on other grounds sub nom. Matsushita Electronic Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but to the extent that the district court was making a discretionary ruling premised on a permissible view of the law we may review the ruling only for an abuse of discretion. *See id.* at 265–66.

### 1. *The Business Records Exception*

The business record exception to the hearsay rule requires that the witness who lays the foundation for the admission of the evidence testify that: (1) the declarant in the records had knowledge to make accurate statements; (2) that the declarant recorded the statements contemporaneously with the actions which were the subject of the reports; (3) that the declarant made the record in the regular course of the business activity; and (4) that such records were regularly kept by the business.[17]

---

**16.** Furst contends, and the government does not disagree, that to the extent the FCCB/FFCM documents are admitted for the truth of their contents, they are hearsay as defined by Fed.R. Evid. 801(c). The government also does not contend that Furst is wrong in asserting that such hearsay is inadmissible unless within an exception to the rule.

**17.** The business record exception to the hearsay rule provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(6) *Records of a regularly conducted activity.* A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted

■ It is clear that neither witness called by the government had any knowledge as to the accuracy of the information on which the FCCB/FFCM documents was based or as to the knowledge of the persons who prepared the records. Neither Burns nor Aderhold knew that the commodities trades reported in the FCCB/FFCM statements were made, nor did they know whether the individual sending reports of the trades to CIS/ADP had such knowledge. Consequently, neither Burns nor Aderhold was a "qualified witness" with respect to the manner in which FCCB/FFCM maintained or compiled its records and, thus, neither provided the necessary foundation for the admission of these documents.

■ We recognize that documents may be admitted under the business record exception to the hearsay rule when circumstantial evidence provides the necessary foundation. *See In re Japanese Electronic Products Litigation,* 723 F.2d at 288. And, although the government maintains that the NC Bank records that verify the dates and amounts of deposits and receipts with FCCB/FFCM serve to provide circumstantial evidence for such a foundation, the NC Bank records do not verify significant portions of these documents—that is, the remaining value of the commodities investment is not independently verified by the NC Bank records. Thus, we conclude that the government failed to lay the proper foundation for the admission of the FCCB/FFCM statements not contained in the NC Bank files.[18]

■ The government contends that the early FCCB records found in the NC Bank files were admissible as NC Bank records. *See* brief of appellee at 26–27. To the very limited extent that these documents confirm data transmitted between NC Bank and FCCB, we agree. In other words, these documents may be considered NC Bank records to the extent that they confirm the transfer of funds between NC Bank and FCCB. With respect to the contemporaneous value of the FCCB investment, however, the records are inadmissible inasmuch as the government has failed to establish a proper foundation for their admission.[19] Clearly, NC Bank had no independent knowledge of the value of these investments on the dates shown in the record nor did it know how the person who prepared the records obtained his knowledge of them.

We also note that Furst raised an additional objection to the admission of these documents under the business record exception. *See* Trial Transcript of Jan. 10, 1989, at 91–92. He contended that inas-

by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, *all as shown by the testimony of the custodian or other qualified witness,* unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling · of every kind, whether or not conducted for profit.
Fed.R.Evid. 803(6) (emphasis added).

18. The government also argues that the FCCB/FFCA records could be admitted as business records of CIS/ADP. *See* brief of appellee at 27. The district court did not consider this argument, observing that if "they were the business records of CIS we would have a question of relevance." Trial Transcript of Jan. 10, 1989, at 91.
 Moreover, the government's assertions that the business records need not be generated or maintained within a single business entity miss the point. The issue is not whether a witness from outside FCCB/FFCM, as opposed to an insider, can ever lay a foundation for the admission of these documents; the issue is whether the witness, whether insider or outside, has sufficient personal knowledge from which to testify to the elements required to establish the foundation. In this case Burns expressly denied having the requisite knowledge.
 While the government is correct in asserting "that the purpose of the business record exception is to avoid having to call as witnesses *every employee* that transacts business for a firm, to explain in detail how each and every transaction was conducted," brief of appellee at 28 (emphasis added), in this case the government did not call a single employee to explain the origin of the data reflected in the documents.

19. In fact, the characterization of the statements as NC Bank records would seem to merely create a double hearsay problem.

much as FCCB/FFCM has been subject to federal investigation for its practices, that the surrounding circumstances suggest that its documents lack the requisite trustworthiness. Under our analysis, this contention is moot except to the extent that it would bar the admission of those records contained in NC Bank's files for the limited purpose of confirming the transfers between NC Bank and FCCB. It is clear, however, that the FCCB records are sufficiently trustworthy when so limited in time and use since they merely confirm NC Bank's other records.

Thus, we conclude that the district court erred in admitting, under Fed.R.Evid. 803(6), the FCCB/FFCM statements not contained in NC Bank's files and in admitting even those statements found in NC Bank's files to the extent the statements contained any data other than confirmations of transactions with NC Bank.

### 2. *The Residual Exception*

Although the district court did not rely on Fed.R.Evid. 803(24) in admitting the FCCB/FFCM documents, the government argues that their admission was appropriate inasmuch as the residual exception provides an independent basis for the ruling.[20]

■ We note at the outset that Fed.R. Evid. 803(24) is not limited in availability as to types of evidence not addressed in the other exceptions; Fed.R.Evid. 803(24) is also available when the proponent fails to meet the standards set forth in the other exceptions. *Cf. In re Japanese Electronic Products*, 723 F.2d at 301 (implicitly holding that Fed.R.Evid. 803(24) may be invoked when a proponent fails to establish admissibility under one of the other hearsay exceptions).

■ On appeal Furst maintains that the government failed to comply with the notice requirements [21] of Fed.R.Evid. 803(24), the final sentence of which provides that

a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The government argues that Furst waived this ground by not asserting it at trial. *See* brief of appellee at 29 n. 14. We find no merit to the government's position.

The district court observed in the sidebar discussion with reference to the admission of the FCCB/FFCM statements that the government had indicated at the pre-trial conference that it would not seek to admit the FCCB/FFCM statements. *See* Trial Transcript of Jan. 10, 1989, at 92–93; appellant's app. at 640–41. In addition, the government did not rely primarily on Rule 803(24) and the court did not rule on that basis. Inasmuch as only passing reference

---

**20.** The residual exception to the hearsay rule provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> (24) *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse

party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed.R.Evid. 803(24).

**21.** In addition, Furst argues that Fed.R.Evid. 803(24) was inapplicable inasmuch as Fed.R.Evid. 803(6) was the exclusive basis for admission of hearsay business records. He also asserts that Fed.R.Evid. 803(24) was unavailable because the government failed to establish that the documents had "equivalent circumstantial guarantees of trustworthiness," and because the government failed to establish that it could not obtain more probative evidence through reasonable means, as, for example, by calling someone who had worked for FCCB/FFCM.

was made to the residual exception, and the district court implicitly indicated that no response was necessary we cannot conclude that Furst waived any objection to that ground by not objecting at that time.

■ In the absence of a waiver, we consider the merits of Furst's argument that the government did not comply with the notice requirements of Fed.R.Evid. 803(24). Although Furst had filed a motion to exclude the FCCB/FFCM records on December 22, 1988, the record indicates that the government did not respond until it served a memorandum on Furst's attorney on January 9, 1989, at the start of the trial.[22] Furst's memorandum addressed only the possibility that the government would rely on the business record exception when offering the FCCB/FFCM records. The government's response raised both the business record exception and the residual exception. Thus, the first reference to the residual exception was on the first day of trial, one day prior to the government's effort to introduce the records. On these facts we cannot conclude that the FCCB/FFCM records were admissible under Fed.R.Evid. 803(24).

### 3. Harmless Error Analysis

■ Although we conclude that the district court erred in admitting the FCCB/FFCM statements not found in NC Bank's files and in not limiting the admissibility of the FCCB/FFCM statements found in NC Bank's, under Fed.R.Crim.P. 52(a) we may nevertheless affirm the convictions if it is "highly probable that the evidence did not contribute to the jury's judgment of conviction." *United States v. Asher*, 854 F.2d 1483, 1500 (3d Cir.1988) (quoting *Government of the Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir. 1976)), *cert. denied*, —— U.S. ——, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989).

Furst concedes that the investment in FCCB/FFCM had declined in value by as much as $700,000.00 of the $909,100.00 investment and that he knew of that loss. The relevance that the FCCB/FFCM statements have to the charges that Furst made

false statements in bank records is to establish his motive for engaging in the internal stock trades and for cloaking the source of the funds generated in those trades. In the circumstances, since the existence of the loss was not in doubt, the FCCB/FFCM statements were not significant with respect to counts V, VI, and VII. Furthermore, it was perfectly clear from the NC Bank records regarding the Rocking Horse transaction that the NC Bank statements falsely attributed distributions from the Rocking Horse transactions to the FCCB/FFCM investment. Thus, it is highly probable that the FCCB/FFCM statements did not contribute to the conviction on those counts.

With respect to the charges of making false statements in ERISA records in counts X and XI, we likewise conclude that based on the record as a whole the admission of the FCCB/FFCM records was harmless. NC Bank's own records indicate that the WOA annual reports for 1984 and 1985 contained false statements. As discussed above, Aderhold's testimony and the documentary evidence clearly supported the government's case on these counts. While the presence of the FCCB/FFCM statements may have explained Furst's motive for the falsification, the evidence on the counts, even in the absence of the FCCB/FFCM statements, was such that it is highly probable that the admission of the statements did not contribute to the convictions on counts X and XI.

We conclude, therefore, that the admission of the FCCB/FFCM statements does not require a new trial on counts V, VI, VII, X, and XI.

### B. Marston's Testimony

The government called David W. Marston, GB's attorney, to testify as to Furst's statements at the October, 1986, meeting between GB officers, Richard East, and Furst. Furst asserted that his communications were privileged by virtue of an attorney-client relationship with Marston and that Marston, consequently, could not testi-

---

22. The court's copy of the memorandum was filed January 10, 1989.

fy as to Furst's statements at this meeting. After a hearing on this issue the district court ruled that Furst's communications were not privileged and that Marston could testify.[23]

Although the applicability of the privilege is a factual question, we exercise plenary review over the district court's determination of the scope of privilege. *See In re Bevill, Bresler and Schulman Asset Management Corp.*, 805 F.2d 120, 124 (3d Cir.1986) (quoting *United States v. Liebman*, 742 F.2d 807, 809 (3d Cir.1984)).

We note initially that the fact that Marston was GB's attorney is not dispositive. It is well settled that when an attorney represents two clients the privilege applies to each of those clients as against a third party. *See United Coal Cos. v. Powell Construction Co.*, 839 F.2d 958, 965 (3d Cir.1988). Thus, in "joint consultation" situations the privilege protects each client. If the October, 1986, meeting was such a joint consultation, then Furst could properly have asserted the attorney-client privilege as a bar to Marston's testimony, even though Marston had an attorney-client relationship with GB.

■ A review of the circumstances of the meeting indicates, however, that it was not a joint consultation. First, it appears that Furst was directed to attend the October, 1986, meeting to explain the allegations relating to his actions while still an employee of NC Bank. Thus, the meeting was an adversarial encounter between Furst and the GB officers. Second, Marston was not present at the start of the meeting, a fact undermining the reasonableness of Furst's asserted belief that those present at the meeting were jointly seeking Marston's legal counsel. Third, the meeting concerned matters which directly involved only Furst and not the other participants at the meeting, for its purpose was to give Furst an opportunity to explain the allegations about him to his new associates. It was not a meeting at which the participants consulted with an attorney as to how to approach a common problem.

■ Moreover, even if the meeting constituted a joint consultation such that Furst had an attorney-client relationship with Marston, that is not in itself sufficient to invoke the attorney-client privilege as a bar to Marston's testimony. Furst's statements must have been made in confidence. "It is the essence of the privilege that it is limited to those communications which the client either expressly made confidential or which he could reasonably assume under the circumstances would be understood by the attorney as so intended." *McCormick on Evidence* § 91, at 217 (E. Cleary ed. 3d ed. 1984); *accord In re Grand Jury Proceedings*, 727 F.2d 1352, 1355–56 (4th Cir. 1984); *see also In re Grand Jury Empanelled February 14, 1978*, 603 F.2d 469, 474 (3d Cir.1979) (specifying that the communication be "made in confidence" as one of the eight elements for assertion of the privilege).[24]

Inasmuch as Furst did not expressly state that his communications at the meeting were confidential, he may assert the attorney-client privilege only if in the circumstances of the meeting, he could have reasonably expected that Marston would understand that Furst intended that the communications be confidential.[25] However, the same facts that indicate that the meeting was not a joint consultation pre-

---

**23.** Fed.R.Evid. 501 provides that with respect to privileges the federal courts "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

**24.** On appeal Furst relies on our statement that "[a]ll legal communications entered into with the expectation of privacy are privileged whatever the initial purpose of the consultation." *United States v. Liebman*, 742 F.2d at 810. Quite simply, this quotation is taken out of context. In *Liebman* we addressed the scope of communications which may be protected rather than the issue of whether an unstated, unreasonable, subjective belief that the communication was confidential would serve to establish the privilege.

**25.** *Cf. In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir.1979) ("because the privilege obstructs the search for the truth and because its benefits are, at best, 'indirect and speculative,' it must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'").

cludes us from concluding that Furst had a reasonable expectation in confidentiality. In addition, even had Furst believed that he, together with the officials of GB, were engaged in a joint consultation with Marston, the presence of East, who was not an official of GB, should have served to undermine any expectation that Furst might have had in the confidentiality of their communications.[26]

While the mere presence of a third person does not necessarily destroy the application of the privilege, East was not an eavesdropper and was not acting as an attorney or agent at the meeting. Inasmuch as the party asserting the attorney-client privilege bears the burden of proving that it applies, *see In re Grand Jury Empanelled February 14, 1978*, 603 F.2d at 474, it is clear that Furst failed to demonstrate that his statements at the October, 1986, meeting were made with a reasonable expectation of confidentiality.

On the basis of these facts, we conclude that the district court correctly found that Furst did not have a reasonable expectation that his communications were confidential. Thus, Marston was properly allowed to testify.

### C. *Limited Cross Examination of Government Witness*

■ The government produced as a witness, Richard Neidig, who had served as Furst's assistant and who had actually prepared the paperwork in connection with the two internal stock trades. During cross examination Furst sought to establish that Neidig had an "innocent mental state" during these transactions. The government objected to this inquiry on grounds of relevance and the district court sustained the objection. Furst asserts that the district court erred in this ruling.

A district court's rulings on the permissible scope of cross examination are within its sound discretion, and may only be reversed for an abuse of that discretion. *See*

*United States v. Apfelbaum*, 621 F.2d 62, 65 (3d Cir.1980).

Furst argues that the limitation of his cross examination of Neidig was significant because Neidig's innocent state of mind was probative of Furst's state of mind inasmuch as Neidig was operating under Furst's supervision. We cannot accept this argument as we do not comprehend what Neidig's state of mind had to do with that of Furst for a person acting under the direction of another might not have the same information as his supervisor. In any event, inasmuch as the testimony sought was merely duplicative of that Neidig had already provided, it was well within the discretion of the district court to sustain the government's objection to this one question:

Q: In September 1985 when you had the conversation with Mr. Furst about the Machine Vision transaction, did you understand or did you have any feeling in your mind that what you were being asked to do was a criminal act?

A: No.

Q: Would you have complied with Mr. Furst's instructions if you believed that he was instructing you to do a criminal act?

A: No.

Q: Did you believe that what he was instructing you to do was illegal?

Mr. Samuelson: Objection, Your Honor. His intent is irrelevant.

Appellant's app. at 379.

Moreover, even if the district court had erred in limiting Furst's cross examination of Neidig, we would view the error as harmless since Neidig had already answered several similar questions.

### D. *Cross Examination of Furst's Character Witnesses*

■ Prior to calling his character witnesses Furst moved the district court to limit the scope of their cross examination. Specifically, Furst sought to ensure that cross examination of witnesses testifying

---

**26.** Furst asserts that he was unaware of East's status and that as a result his expectation of

confidentiality remained intact.

as to their opinions of Furst's character, as opposed to witnesses testifying as to his reputation, would be limited to inquiries relating to the period prior to indictment. The district court refused to limit the scope of the cross examination. As a result Furst limited his direct examination of these witnesses to their opinions of Furst as of the time prior to Furst's indictment.

On appeal Furst argues that he was entitled to greater latitude in his direct examination of his character witnesses without expanding the scope for prospective cross examination. As stated above, a district court's rulings on the permissible scope of cross examination may only be reversed for an abuse of discretion. *See United States v. Apfelbaum,* 621 F.2d at 65. Moreover, in rulings on character evidence the district court has wide discretion.

At the outset on this issue we distinguish character witnesses' testimony regarding reputation from testimony of opinions relating to character. Under · the Federal Rules of Evidence these remain separate types of character evidence. *See United States v. Curtis,* 644 F.2d 263, 267–69 (3d Cir.1981), *cert. denied,* 459 U.S. 1018, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982). This appeal presents an issue only as to the character witnesses' opinion testimony.[27]

When on direct examination a witness is asked to express his current opinion as to relevant characteristics of the defendant, cross examination may include questions relating to acts up to the time the witness testifies. *See United States v. Morgan,* 554 F.2d 31, 32–33 (2d Cir.1977), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977).

Furst argues, however, that his motion did not seek to exclude questions relating to all acts after Furst's indictment, but that he sought to preclude the government's use of a hypothetical question which directed the witness to assume Furst's guilt.

When Furst initially raised the issue of imposing a limitation on the scope of cross examination he stated:

> a witness who testifies to his own personal opinion of the defendant, that I think the witness is entitled to have that opinion as of the day he testifies. And the government cannot destroy the opinion by asking the witness to accept as true the allegations and the charges which the government is attempting to prove in this courtroom.

Appellant's app. at 596–97.

Thus, he was seeking a subject-based limitation on the cross examination rather than a time-based limitation.

The government did not respond in terms of a subject-based restriction and the district court did not frame its ruling in such terms. On the basis of the district court's ruling Furst's counsel limited the opinion evidence he solicited to that period preceding the charges against Furst; that is, Furst imposed a time-based restriction on himself to prevent cross examination in the form of the hypothetical question he sought to avoid.

On appeal Furst asserts that it would have been improper for the government to have cross examined the character witnesses by asking them to assume his guilt and then to reconsider their opinions in light of this assumption. Brief for appellant at 34–35. Consequently, Furst argues that his direct examination was improperly restricted as a result of the district court's failure to limit cross examination to the proper scope.

It should, of course, be noted that even assuming that Furst is correct and that the district court erred by not limiting the scope of the government's cross examination, it is not clear that Furst has preserved this point for appeal. We note that the restriction of which Furst complains was

---

**27.** To the extent that Furst's appellate brief may be understood to raise the scope of cross examination on reputation testimony as well, *see* brief for appellant at 16, that issue was not properly preserved for appeal. Furst waived his right to assert that his direct examination as to reputation was limited as a result of the district court's refusal to limit cross examination when his counsel indicated to the district court that "I am perfectly happy to accept a limitation on hearsay reputation in the community which applies to the period prior to the time [Furst] was charged." Appellant's app. at 596.

self-imposed as he limited the scope of his direct examination of the character witnesses. He was not compelled to do this. Thus, the government did not cross examine the character witnesses in any fashion that Furst asserts was improper. Had the government posed a hypothetical question on cross examination Furst could have objected at that time and, if the court had overruled the objection, Furst could have raised the issue on appeal.

Since Furst's character witnesses were not asked to express their opinions of Furst at any time after the indictment, they were never exposed to the cross examination Furst sought to preclude. Hence, any harm is entirely speculative. *Cf. Luce v. United States*, 469 U.S. 38, 41, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984) (addressing the assertion of error in a ruling on the scope of impeachment evidence after which the criminal defendant did not testify); *United States v. Dunbar*, 767 F.2d 72, 74 (3d Cir.1985) (same). Moreover, we have no way of knowing whether the government would have asked the questions and as to whether the district court would have overruled an objection to the specific questions. *See Luce*, 469 U.S. at 41, 105 S.Ct. at 463 ("When the defendant does not testify, the reviewing court also has no way of knowing whether the Government would have sought to impeach with the [evidence sought to be excluded]"); *see also id.* ("A reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context").

However, we need not decide whether Furst has preserved this issue for appeal inasmuch as we perceive no prejudice to Furst's defense from the court's ruling. The district court instructed the jury as to the reason Furst's character witnesses were asked to express their opinions only as of the time prior to Furst's indictment. The court had established the date of May, 1988, as the limit for direct examination without opening the door on cross examination of the effect of the August 28, 1988, grand jury indictment on the witness's opinion of Furst. *See* appellee's app. at 699, 703. After a character witness was

asked his opinion of Furst's character as of May, 1988, the court explained to the jury:

Ladies and gentlemen of the jury, you have heard two witnesses and you may hear additional witnesses that are being called by the defense in this case.... [Y]ou've heard these individuals testify as to their own opinion about these traits.

And counsel with the last witness went into that with a cutoff date of May of 1988. And we have deliberately set up that as a cutoff date because that's the time when the indictment or charges were filed in this case.

And we are eliciting the opinion up until that point, without going into the affect of someone's opinion might have simply because charges have been filed against an individual.

Appellee's app. at 702–03.

In light of this instruction we must conclude that the district court's error, if any, was harmless. Consequently, under Fed. R.Crim.P. 52(a) the error, if any, is not remediable on appeal.

E. *Admissions Against the United States*

■ Furst sought to introduce a February, 1986, administrative complaint of the Commodities Futures Trading Corporation (CFTC) which had alleged that FCCB/FFCM had made fraudulent misrepresentations together with a subsequent federal grand jury indictment of FCCB/FFCM. He presented both the complaint and the indictment as adoptive admissions of the United States but the district court admitted neither the complaint nor the indictment. We need not address Furst's rather resourceful argument on this point, as even if, which we doubt, the district court erroneously excluded this evidence, the exclusion was clearly harmless.

The complaint and indictment were offered to undermine the credibility of the FCCB/FFCM statements. As we indicated above, the FCCB/FFCM statements themselves were irrelevant to Furst's conviction under counts V, VI, and VII except to the extent they indicated the $700,000.00 loss

and Furst's knowledge of that loss. Similarly, under counts X and XI the admission of the FCCB/FFCM records was harmless error.[28] Having concluded that it was highly probable that the FCCB/FFCM records did not contribute to the jury's judgment of conviction, it follows that if the exclusion of the evidence tending to undermine those records was erroneous, it also was harmless error.

In addition, even had the jury relied on the FCCB/FFCM statements, we would continue to view the exclusion of the administrative complaint and indictment as harmless. As the district court noted, Furst had succeeded in introducing other evidence of the government investigations of FCCB/FFCM. *See* appellant's app. at 634–44, 688–91. The same allegations which were the subject of the administrative complaint and indictment were elicited in the form of testimony, as the subject was discussed in the cross examination of Burns, *see* Trial Transcript of Jan. 10, 1989, at 24–26, 28–31, 40, 46–47, and in the cross examination of Aderhold, *see* Trial Transcript of Jan. 11, 1989, at 91–93. Furthermore, the large losses attributable to the FCCB/FFCM investment were known to the jury and it is our sense from the record that anything regarding FCCB/FFCM must have seemed suspect to the jury.

Consequently, the error, if any, in excluding evidence attacking the credibility of the records was harmless.

### F. *Conclusion*

None of the five asserted trial errors justify a new trial on counts V, VI, VII, X, or XI. The admission of Marston's testimony and the limitation on Furst's cross examination of Neidig were proper. The admission of the FCCB/FFCM records was a harmless error. The scope of cross examination permitted to the government with respect to Furst's character witnesses and the exclusion of the complaint and indictment against FCCB/FFCM were harmless errors, if errors at all. Consequently

we will affirm the convictions for false statements in bank records as alleged in counts V, VI, and VII, and the convictions for false statements in ERISA records as alleged in counts X and XI.

## IV. GROUNDS FOR A NEW SENTENCING

Since we will acquit Furst of the charges on counts III, IV, and IX, and inasmuch as we are unable to determine the effect his conviction under those counts may have had on his sentence under counts V, VI, VII, X, and XI, we will vacate the sentence on those counts and remand for a new sentencing. *See United States v. Salamone*, 869 F.2d 221, 234 (3d Cir.1989) (citing *United States v. Sebetich*, 776 F.2d 412, 415 & n. 2 (3d Cir.1985), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988)). We will also direct that on the remand that the case be assigned to a different district judge for resentencing.

As noted above, Furst filed a motion to have the district judge disqualify himself from presiding over his sentencing. In a supporting affidavit, his attorney recited that the judge initiated an *ex parte* conversation on the day following the opening and expressed surprise that no plea agreement had been reached and that he did not think a serious or severe sentence was warranted. The attorney further recited that about one week later during the trial the judge renewed the conversation about the plea agreement in another *ex parte* conversation in which he indicated that if a plea agreement could be reached a prison sentence would be imposed which would not be severe and which would be served in pleasant circumstances but that the situation would be entirely different if Furst was convicted at trial. The district court denied the motion, primarily because it regarded it as untimely, but secondarily because it found no merit in the motion.

Ordinarily, a district judge's decision with respect to recusal may be re-

---

**28.** To the extent the complaint, indictment, and FCCB/FFCM records themselves were relevant to any of the other counts the issue of the admissibility of the complaint and indictment is moot.

versed only for an abuse of discretion. *See United States v. Dalfonso,* 707 F.2d 757, 760 (3d Cir.1983). To the extent, however, that the judge's decision rests on an incorrect view of the law our review is plenary. *See United States v. Nobel,* 696 F.2d 231, 234 (3d Cir.1982), *cert. denied,* 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983).

Furst's motion was based exclusively on 28 U.S.C. § 455, the pertinent part of which provides:

(a) Any ... judge ... of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

. . . .

(e) No ... judge ... shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

The motion did not expressly state whether it sought to have the district judge disqualify himself under section 455(a) or section 455(b), and the district court did not clearly identify under which subsection it analyzed the motion.

■ In denying the motion for recusal, the court explained:

There was never an objection initiated by defense counsel at the time of these alleged improprieties, immediately thereafter or at any time prior to the April 3rd filings on the threshold of sentencing scheduled for April 7, 1989.... [A]nd no motions for new trial were filed which could have included claims for bias in the proceedings.

The history of this motion suggests to us that it was untimely, and the tardiness amounts to a waiver. In *United*

*States v. Murphy,* 768 F.2d 1518, 1519 (7th Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986), the Seventh Circuit rejected an argument that Section 455 provided no time limits by concluding that time limits were already so firmly fixed in both statute and common law that there was no need to add another [to § 455]. In the present case, counsel's recitation of events on which his motion is based all occurred in the first half of January 1989.... All legal cultures recognize that timely objections, especially in criminal cases, are essential to allow the objection to be addressed and to permit immediate correction so that correctable prejudice can be erased.

Appellant's app. at 824 (citation omitted). The district court further indicated that the court in *United States v. Murphy* had cited *United States v. Nobel,* 696 F.2d at 231.

Though we do not question the authority of those cases, we do not regard *Murphy* and *Nobel* as particularly helpful here. In *Murphy* the defendant filed a motion for disqualification of the trial judge in a post-sentencing motion. *See* 768 F.2d at 1537. The only basis for the motion was under section 455(a) and the court found that there was no waiver under section 455(e) inasmuch as the defendant had not learned all the relevant facts until after sentence had been imposed. *See* 768 F.2d at 1537–39. Nonetheless, the court of appeals affirmed stating:

[T]he absence of a waiver is not dispositive. The question here is not really whether Judge Kocoras was required to recuse himself when Murphy filed his motion. Judge Kocoras already had imposed sentence; *there were no further proceedings from which Judge Kocoras could be recused. What Murphy wants is not recusal from future proceedings but the nullification of everything that went before.* We conclude that this is not the appropriate consequence of a recusal for appearance of impropriety.

In cases decided under § 455(a), disqualification runs from the time the motion was made or granted....

. . . .

. . . At all events any appearance of impropriety under § 455(a) is not actual impropriety, so that recusal does not retroactively invalidate judicial acts that preceded the motion Murphy filed.

*Id.* at 1539–41 (emphasis added).

The situation in *Murphy* was unlike that here. Furst filed his motion for disqualification while there remained some proceeding over which the judge would preside and the motion was directed only to that proceeding.

*Nobel* is equally inapplicable. In *Nobel* the district judge held a pretrial conference at which he disclosed the ground on which a party later faulted him for not recusing himself. *See* 696 F.2d at 233. At the pretrial conference the judge expressed his view that there was no basis for recusal and he requested the views of counsel. *See id.* Counsel agreed with the judge's conclusion. *See id.* After a judgment of conviction in the district court, Nobel asserted on appeal that the judge had erred in not recusing himself. *See id.* at 234.

This court rejected Nobel's interpretation of section 455(b)(4), *see* 696 F.2d at 234, so that the only other argument for recusal arose under section 455(a). *See* 696 F.2d at 235. Inasmuch as section 455(e) allows the waiver of section 455(a) grounds for recusal, we held that the district judge did not err in failing to recuse himself since the judge had obtained such a waiver at the pre-trial conference. *See* 696 F.2d at 236.

Our analysis in *Nobel* did not address the situation when a motion for disqualification is filed in the district court while some proceeding remains over which the judge will preside. We merely construed the waiver provision of section 455(e) to preclude a party from raising for the first time on appeal the argument that a judge should have recused himself when the judge had disclosed potential grounds for recusal under section 455(a).

The situation here is quite different. Although it could have been presented sooner, the motion was presented to the district court prior to a proceeding over which the judge would preside.

Moreover, this case does not fit the practice we described in *Smith v. Danyo*, 585 F.2d 83 (3d Cir.1978). Furst was not "a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming." *Id.* at 86. Rather, this case is like *Danyo* itself, in which the parties filed a motion for recusal prior to trial but three months after the facts giving rise to the allegation of bias. On those facts this court concluded that the filing "before the [movant] had called upon the trial court for any new rulings, was timely." *Id.*

We thus conclude that the district court did not treat Furst's motion for disqualification under the correct criteria. While the district court acknowledged that its recusal from sentencing was all that Furst sought, it relied on authorities dealing with situations in which recusals were sought to upset what had already been done. Furthermore, the asserted bias was germane only on sentencing, as Furst did not suggest he could not get a fair trial before the judge.[29] Finally, it would have been possible for the trial judge to recuse himself from the sentencing. Thus, we cannot affirm the district court's denial of the motion for recusal on the basis that it was untimely and we will consider the merits of the motion.[30]

---

**29.** Indeed, he does not contend that he did not get a fair trial, and on our examination of the record it is clear that he did, in this very difficult case. It is also only fair to point out that Furst's attorney was treated with personal courtesy as, according to the judge's opinion on the disqualification motion, he was granted a continuance of the trial, in part because he needed time to get the records of FCCB and in part because he was being married around the holi-

days and would be away until the proposed trial date of January 3, 1989.

**30.** On appeal the government asserts a different timeliness argument as a basis for affirming the district court's order denying recusal. The government contends that the proximity of the motion to the sentencing serves to render the motion untimely. We do not agree.

In this case notice of the sentencing was mailed to Furst on March 20, 1989, and the

Section 455, under which Furst filed his motion, does not establish any form of procedure for consideration of recusal motions. *Cf. Nobel,* 696 F.2d at 236–37 (stating that § 455 does not provide express procedure for waiver). On the other hand, 28 U.S.C. § 144 [31] sets forth a procedure by which a party may seek a judge's recusal. Thus, we will look to section 144 and our case law under that recusal provision for guidance as to procedure. *Cf. Johnson v. Trueblood,* 629 F.2d 287, 290 (3d Cir.1980) ("both statutes require the same type of bias for recusal"), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *id.* ("§ 455(a) was intended only to change the standard the district judge is to apply to his or her conduct").[32] This seems particularly appropriate as Furst's attorney's affidavit filed with the motion for disqualification complied with the procedure set forth in section 144, and so, had the motion merely included a reference to section 144, we would have analyzed the motion directly under that section.

In *Mims v. Shapp,* 541 F.2d 415 (3d Cir.1976), we held that a district judge faced with a motion for disqualification under 28 U.S.C. § 144, must accept the allegations of the moving party as true, stating:

> Probably the district court is right that there is no basis for the allegations made. That, however, is not the issue in

deciding a motion made pursuant to 28 U.S.C. § 144. On such a motion it is the duty of the judge to pass only on the legal sufficiency of the facts alleged to ascertain whether they support a charge of bias or prejudice. Neither the truth of the allegations nor the good faith of the pleader may be questioned, regardless of the judge's personal knowledge to the contrary. The test is whether, assuming the truth of the facts alleged, a reasonable person would conclude that a personal as distinguished from a judicial bias exists.

541 F.2d at 417 (citations omitted).

Here the district court concluded that section 455, unlike section 144, "does not require the judge to accept all allegations by a moving party as true," appellant's app. at 820. Yet, its memorandum accompanying the order denying the motion to recuse acknowledged that there had been two meetings with Furst's attorney. The court explained that on January 10, 1989, after counsel had been invited into the judge's chambers, and after social conversation, the judge "briefly offered to extend the cut-off date for plea bargaining in the event counsel had not had sufficient time to explore a plea agreement at a time he was preparing to move ahead with his wedding. This was received by defense counsel without a yea or a nay." Appellant's

---

motion was filed on April 3, 1989. Excepting weekends, Furst's motion was filed ten days after notice of sentencing was mailed. This time was further shortened by the delay in receiving the mailed notice. We further note that one of the ten days counted was Good Friday. On the basis of these facts we conclude that Furst did not unreasonably delay in filing this motion. *Cf. Samuel v. University of Pittsburgh,* 395 F.Supp. 1275, 1279 (W.D.Pa.1975) ("The statute's reference to terms of court being obsolete, the inquiry into timeliness is concerned with the movant's reasonable diligence in filing such an affidavit."), *vacated on other grounds,* 538 F.2d 991 (3d Cir.1976).

**31.** Section 144 states:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of an adverse party, such judge shall

proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

**32.** The major benefit that a party receives by filing a motion for disqualification under section 455 instead of section 144 is that section 455(a) obviates the need to assert actual bias—if it is shown that the judge's impartiality might reasonably be questioned recusal is required. To the extent that Furst's motion asserted only actual bias under section 455(b) he would have received no discernable benefit from filing under this section.

app. at 822. At the conclusion of a later trial day, the judge requested that Furst's attorney come to his chambers the following day. The court explained that at that second meeting.

> counsel was asked if anything resulted from the earlier discussion when we offered to extend the cut-off for a plea bargain. We believe the response was in the negative without elaboration. We briefly discussed the progress in the case to include some assertion that the government would probably have no interest in bargaining once it had presented its case. Again, defense counsel responded without a yea or nay, and was not pressed in the matter.

Appellant's app. at 823.

Thus, the district court acknowledged that there were two *ex parte* communications with Furst's attorney. Moreover, the court acknowledged that in each of these communications one topic was the possibility of Furst entering into a plea bargain. The court merely disagreed with Furst's characterization of the communications as "suggest[ing] plea bargaining or a plea of guilty," appellant's app. at 823, and with the attorney's conclusion that the statements "reflect a judicial attitude based on private opinions and personal bias which might impinge on the court's ability to be impartial throughout the trial and into the sentencing phase." Appellant's app. at 823.

As a result of the extent to which the district court confirmed the underlying facts upon which the recusal motion relied, we need not resolve the issue of whether a judge need accept as true the allegations presented in a motion for disqualification under section 455 which asserts a basis as to which section 144 is applicable and which includes an affidavit sufficient under section 144. It is sufficient that we state that where the basic underlying facts as set forth in the affidavit supporting a recusal application are not in dispute, the district court should not minutely examine the movant's characterization of them, and weigh the court's memory of what happened against that of the affiant. We think it simply inappropriate in the circumstances here for the court to have made a credibility assessment of itself. Consequently, we hold that the district judge improperly considered the truth of the asserted grounds for his recusal.

Thus, our remaining inquiry is whether the allegations were "legally sufficient" for recusal. Here we are satisfied that the allegations of the motion and affidavit for disqualification were sufficient to have required recusal, as taking the allegations as true, the judge's impartiality, though only in sentencing, might reasonably be questioned. 28 U.S.C. § 455(a). According to the attorney's affidavit, the judge made it clear that he was anxious for a guilty plea and would award a longer sentence to be served in unpleasant circumstances, following a conviction trial. Thus, it was reasonable to conclude, taking the attorney's affidavit as true, that the judge's attitude as to sentence was based at least to some degree on the fact that the case had to be tried, an exercise which the judge seemed anxious to avoid.[33]

## V. CONCLUSION

We will reverse Furst's convictions under counts III, IV, and IX, and will remand for entry of an order of acquittal on those counts. We will affirm Furst's convictions under counts V, VI, VII, X, and XI, but we will vacate the sentence imposed on those counts and will remand for resentencing before a different district judge.

---

**33.** While we are ordering a resentencing, we do not imply that the sentence imposed was inappropriate.