JOHN R. GIBSON, Senior Circuit Judge,
dissenting.
I respectfully dissent.
The Court today painstakingly analyzes the history of Rule 701 and its intended relaxation of the rules regarding opinion evidence. The Court then develops a “core area” of Rule 701 lay opinion testimony and unduly limits the admissibility of testimony outside of that core area. In order to do so, the Court imposes on Rule 701 the language and requirements of Rule 702 that a demonstration of the witness’s knowledge and experience support the opinion, and thus abrogates the distinction between Rule 701 and 702 in the area of technical opinion evidence. The Court then determines that the district court did not use “sufficient rigor” in determining “whether the testimony in question was informed by sufficient experience or specialized knowledge,” swpra at 1193, and utilizes an essentially discretionary rule under the guise of plenary review. In my view, the district court properly applied Rule 701, and did not abuse its discretion in admitting the evidence.
I.
Today the Court argues that the district judge’s ruling on the admissibility of Jones’s opinion evidence involved interpretation of Rule 701 and, accordingly, should be given plenary review. The authority relied upon simply does not bear the weight which the Court places on it.
In DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941 (3d Cir.1990), this Court held that the district court’s “cursory” ruling excluding expert testimony erroneously interpreted the Federal Rules in two respects: (1) the court analyzed the expert’s qualifications under Rule 703, rather than Rule 702, id. at 953; and (2) the court implicitly required the expert to accept a study’s conclusion in order to utilize the underlying data as a basis for testimony, although Rule 703 contains no such requirement. Id. at 954. Because admissibility depended on the district judge’s interpretation of Rule 703, the Court applied a plenary standard of review, id. at 944, and remanded the ease for further consideration of the proffered testimony. Id. at 956-57. Most tellingly, the Court instructed that the ruling on remand should display “sensitivity to the relevant policy judgments reflected in the Federal Rules of Evidence,” which “embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact and for dealing with the risk of error through the adversary process.” Id. at 956.
The Court also relies on United States v. Furst, 886 F.2d 558 (3d Cir.1989), cert. denied, 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990), which held that there was insufficient foundation for the admission of business records. Id. at 572. In Furst, the Court articulated the rule the Court today espouses, id. at 571, but did not further indicate which standard it used, stating only that “the district court erred” in admitting the evidence. Id. at 573.
Most significantly, however, both DeLuca and Furst rely upon In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238, 265 (3d Cir.1983), rev’d on other grounds sub nom., Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In that case, this Court held:
*1208 The scope of our review ... depends on the basis for the [trial court’s] ruling. When the trial court makes Rule 104(a) findings of historical fact ... we review by the clearly erroneous standard of Fed. R.Civ.P. 52. But a determination [by the trial court], if predicated on factors properly extraneous to such a determination, would be an error of law. There is no discretion to rely on improper factors.... In weighing factors which we consider proper, the trial court exercises discretion and we review for abuse of discretion.
Id. at 265-66. The Court proceeded to apply all three standards. Most critically relevant for our purposes, the Court held that the district court erred in developing its own standards and in acting as the ultimate arbiter of the reliability of the materials upon which the expert based his opinion. See Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 505 F.Supp. 1313, 1321-30 (E.D.Pa.1981), rev’d, In re Japanese Elec. Prods., 723 F.2d 238. This Court held the district court’s approach to be “fundamental legal error because, as a matter of law, the district court must make a factual inquiry and finding as to what data experts in the field find reliable.” In re Japanese Elec. Prods., 723 F.2d at 277.[1] This Court held that the district court’s approach “rejected] the decision of the Judicial Conference, the Supreme Court, and Congress” in “adher[ing] to an unusually restrictive view as to the basis on which an expert’s opinion may be laid.” Id. at 277. The ruling of the district court, containing legal interpretation of the meaning of the Rule, was correctly subjected to review under a plenary standard.
The record before us stands in sharp contrast to that in DeLuca and Furst, and, particularly, to that in In re Japanese Electronic Products. In the case before us, the district court did not involve itself in an interpretation of the Rule as in DeLuca and In re Japanese Electronic Products. Those cases cannot support application of the rule of plenary review in this case.
Nothing in the record indicates that the district judge engaged in interpretative analysis of the meaning of Rule 701. Rather, the district judge carefully analyzed Jones’s deposition testimony and found it admissible by applying the Rule. His analysis was quintessentially an exercise of discretion which should be reviewed only for abuse and be given substantial deference. The Court today pays no heed to the district court’s thorough and detailed ruling on the admissibility of Jones’s testimony, but simply casts that ruling aside on the basis of this Court’s own analysis.
II.
A close look at the record reveals that the district judge exercised great care in ruling on the admissibility of this evidence. After reading a portion of the deposition dining consideration of the objections, the district judge remarked:
Just because you [sic] don’t have a sheepskin doesn’t mean he is not an expert. It seems to me he has substantial knowledge in this area, so that because of his employment experience, many years on the job, he can tell whether metal is fatigued; he can tell whether screws, threads, threading of screws, whatever are shorn, whatever, going beyond the ken of a lay person.
(Emphasis added).
The district judge specifically articulated Asplundh’s argument that Jones testified as an expert, not a lay person, and stated that “[u]nder [Rule] 701, of course, we are talking about lay opinion.” The district court expanded upon this by stating:
This guy is not an expert. However, he has all this experience, these are his opinions, these are the reasons for his opinions, but we are not going to call him as an expert. We want to get the evidence in, *1209 let the jury assess it in view of his umpteen years on the force.
After dismissing the jury, the district judge commented to counsel that:
I don’t have any background in metallurgy, but I can take this paper clip and I can bend it for a while. I can give you a pretty good idea when I think it’s going to break because of metal fatigue. And all I do is occasionally use paper clips. That is a lay opinion.
After considering whether the rod’s weakness required expert opinion, the district judge commented: “That would fall within the ambit of common sense embraced by both sides here.” The next morning, the district judge ruled:
Counsel, with respect to the [Rule] 701 issue, I have been reviewing the transcript. ... So, under all the circumstances looking at Rule 701, as I must, and finding ample explanation, be it valid or not within the record for the 701, allegedly 701 opinions there adduced, I am going to overrule the objection and permit that testimony to be read. I believe it goes to the weight.
The record before us reveals a painstaking study of the deposition testimony of Jones and the application of Rule 701 in determining that it was admissible. This evidentiary ruling is palpably an exercise of discretion rather than an interpretation of the Rule.
III.
The Court today rewrites Rule 701, holding that the district court misinterpreted Rule 701 by failing to examine with sufficient rigor whether Jones possessed the knowledge or experience necessary to offer an opinion of a technical nature. Supra at 1198. When the Court’s lengthy analysis and discussion is stripped aside, the holding has two parts: first, the Court has interpreted Rule 701 to incorporate the Rule 702 requirement that there be a demonstration that the witness possesses sufficient experience or specialized knowledge to qualify the witness to express a technical opinion; second, the Court requires that this Rule be examined with sufficient rigor.
The Court articulates the experience and knowledge requirement after an exercise in ambivalence. The Court first refuses to hold “that all lay witnesses offering opinions that require special knowledge or experience must qualify under Rule 702.” Supra at 1201. It so states after having found problematic the views of some courts which would permit a lay witness in technical areas to diminish the need for the “knowledge, skill, experience, training or education” of the witness qualifying under Rule 702. Supra at 1200 n. 12. The Court then states that “the admissibility of opinion evidence under the strictures of Rule 701 is not without limit,” and reads the language of the Rule to require that “a lay opinion witness have a reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion he or she expresses.” Supra at 1201. The Court comments: “[t]he judicial Rule 701 screening that we speak of for cases such as this one is not very different from the screening that attends the ordinary expert qualification ruling.” Supra at 1202. It goes so far as to commend the rule followed in Delaware which excludes lay opinion requiring special knowledge, skill, experience or training. Supra at 1201 n. 14.
The Court holds that “[i]n order to satisfy these Rule 701 requirements, the trial judge should rigorously examine the reliability of the lay opinion by ensuring that the witness possesses sufficient special knowledge or experience which is germane to the lay opinion offered.” Supra at 1201. These are not requirements of Rule 701, but rather Rule 702. Thus, as much as the Court protests, it has indeed stitched to the fabric of Rule 701 the language and requirements of Rule 702. This is directly contrary to the teaching of Daubert v. Merrell Dow Pharmaceuticals, Inc., — U.S. -, 118 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which focused on the language of Rule 702, in issue before it.
If the Court stopped at this point, we could simply observe that the district court made the appropriate findings of experience and knowledge germane to the proffered opinion, based on a lengthy colloquy with counsel and a complete study of the deposition testimony *1210 overnight, before admitting the testimony under Rule 701.
The Court today, however, does not stop with incorporating the provisions of Rule 702 into Rule 701. It adds the “sufficient rigor” requirement, which it gives plenary review.
Indeed, the basis of the Court’s decision is that the district court made an impermissible interpretation of Rule 701 because it “failed to examine with sufficient rigor” whether the testimony was informed by sufficient experience or specialized knowledge. Interpretation of a rule requires a determination of the meaning of the language of the rule. On the contrary, failure to examine the testimony with sufficient rigor involves a value judgment and a weighing of factors, which inherently relate to the exercise of discretion. Failure to examine with sufficient rigor simply does not equate to interpretation. The rationale of the Court can find support only from Lewis Carroll.[2]
Further, the sufficient rigor test creates no legal yardstick upon which the district court’s ruling can be measured. Certainly, with respect to Rule 701 and numerous other evidence questions, the admissibility of evidence involves a determination of where on a spectrum the testimony falls. This is reason for applying an abuse of discretion test to such considerations. It is, however, the trial court’s determination of such questions to which we apply the abuse of discretion rule. Here, the Court has simply moved the exercise of discretion from the district court and into the hands of the appellate court. What is sufficient rigor and what is not simply becomes a call for the appellate court, not unlike the decision of a baseball umpire, except there is no definition of the strike zone.
The Court finds it necessary to concede that the district court “did summarily conclude at one point in its analysis that Jones’s ‘employment experience’ gave him ‘substantial knowledge in this area,’ ” but that the court did not examine “with sufficient rigor the question whether Jones possessed the knowledge or experience necessary to offer an opinion of such a technical nature.” Supra at 1204. The Court today simply refuses to accept that the district court, with a firm understanding of the requirements of Rule 701, made appropriate and sufficient findings to support the admissibility of the evidence.
The Court’s rewritten Rule 701 replaces the district court’s discretion on admitting or rejecting evidence with appellate discretion exercised under a formula with no true objective standard and plenary review. The Court effectively switches the roles of the trial and appellate courts.
IV.
This Court has held that a trial court’s determination of the admissibility of lay opinion testimony “may be overturned only for clear abuse of discretion.” Joy Mfg. Co. v. Sola Basic Indus., Inc., 697 F.2d 104, 111 (3d Cir.1982). Weinstein’s Evidence, citing numerous cases, states succinctly: “Basically, Rule 701 is a rule of discretion.” 3 JACK B. Weinstein et al, Weinstein’s Evidence ¶701[02], at 701-31 (1995). The district court’s careful ruling, which we have discussed above, and the record upon which it was based compellingly demonstrate that the court did not abuse its discretion in admitting the testimony of Jones.
Jones testified regarding differentiations in color at the fracture site and that the rod fatigued and broke.[3] He also testified that *1211 the stop blocks were not relevant to the accident[4] because the rod eye broke off due to the way the rod end was drilled through, threaded, and, thus, weakened.[5] He concluded that this was the problem which caused the failure of the boom. He further stated that he had not seen a cylinder configured in this way.
Jones’s observations were based upon his practical experience. He was fleet maintenance supervisor for the City of Portland at the time of the accident and had held this position for over ten years, supervising between 60 and 100 employees, 6 or 7 city repair shops, and the maintenance of 1,385 pieces of equipment, including the Asplundh aerial lift. In that job, Jones spent 30 percent of his time overseeing the work done and had done mechanical work himself. In a previous job, he riveted blowoff fuel tanks for military aircraft. He stated that he had a high mechanical aptitude and understood the way things worked. Some of the deposition transcript upon which the district court based its ruling is significant, although not introduced into evidence at trial. For example, Jones stated:
Well, even if you work in your own garage, if you take a piece of metal and put it in a vice and bend it back and forth enough times, it fatigues and it breaks. Anyone who’s ever dealt with anything solid knows that. You can do it with a paper clip, bend it until it breaks. That’s fatigue. I certainly know what metal fatigue is through my own knowledge and discovery of the way life works.
Given Jones’s experience, the district court did not abuse its discretion in concluding that he was qualified to express a lay opinion on metal fatigue.
Indeed, the district court considered the factors the Court today requires, specifically, Jones’s substantial knowledge, employment experience, and years on the job. Any interpretation of Rule 701 in this case springs from this Court’s own analysis, rather than the application of Rule 701 by the district court. As the district court simply applied Rule 701 to the proffered testimony, we must judge that determination on an abuse of discretion basis.
The Court today simply gives insufficient weight to the district court’s articulated reasoning that his opinion was based on his experience and that Jones had substantial technical knowledge so as to tell whether metal is fatigued and whether threads are *1212 shorn, which goes beyond the ken of a layperson. The Court should not reject the articulated reasoning of the district court so facilely.
The Court today firmly asserts that metal fatigue is a technical concept, and that “the realm of common knowledge [does not extend] to such issues as the presence and cause of metal failure and the proper design of hydraulic cylinders.” Swpra at 1205. The Court switches the roles of the trial court and the appellate court. The district court made abundant findings not only on Jones’s knowledge and experience, but also on the common knowledge concerning metal fatigue. It is the appropriate role of the district court to make such findings. Today, the Court simply rejects these views and appropriates the factfinding role to itself.
Perhaps the physical process of metal fatigue requires technical knowledge, but the appearance of a metal fracture site demonstrating fatigue failure was described by Jones, and the district court properly concluded this was based on his knowledge, an appropriate subject for lay opinion.
The ruling of the district court and the deference due it must be considered in light of the evident fact that this is a nation where many individuals grow up with extensive mechanical experience and capabilities. Repairing household machinery, automobiles and farm equipment is a central part of life for many individuals, from early to late years, either vocationally or avocationally. Fatigue failure of metal is not unfamiliar to such persons. The testimony given by Jones explaining his background fits squarely into this pattern as the district judge recognized.
Textual support for Jones’s opinions can be found in 8 Am.Jur. Proof of Facts Metal Failure 127 (1960 & Supp.1994), which states that, after a number of cycles of stress, a small crack may form in the metal where the stress is highest and, under continued stress, grow until the metal fractures from overload. Id. at 129. Proof of Facts outlines the signs of metal fatigue, including the fracture pattern on the broken surfaces and the presence of stress raisers such as threads and holes. Id. at 130-31. Proof of Facts describes the markings on fracture surfaces as follows:
A fatigue fracture will often show a characteristic pattern on the fracture surfaces. Frequently there will be two areas that are markedly different in appearance. This is because only a portion fractured from fatigue, the remainder failing from overload. The fatigue portion will often be shiny and will often contain conchoidal or “clam shell” markings which indicate the position of the crack at the various stages of its progression. The overload portion, on the other hand, will generally be duller and will show some ductility or plastic deformation.
Id. at 145 (emphasis added). While Jones did not testify about clam shell markings, he did carefully explain the differing colors of the metal, indicating the development of the fracture, the overstressing of the metal, and the final parting at the fracture surface.
The text discusses the use of experts in analyzing fatigue factors, but closes with the following observation:
While the aid of competent professional help is important in explaining the failure from a scientific standpoint, the assistance that may be given by persons qualified by training and experience in a particular trade or craft should not be overlooked. For example, a knowledge of the properties and characteristics of metals is essential to a blacksmith or welder, and either may have acquired by experience a knowledge as to the dangerous conditions in metals brought about by surface irregularities, notches, tool marks and the like. Similarly, a mechanic experienced in working with trailers would be qualified to testify as to the dangers inherent in a loose trailer hitch, and an elevator repairman may speak authoritatively concerning experience in the industry with cable failures and the standard practice of periodically cutting off and discarding a length of cable to avoid failures.
Id. at 137. Jones’s testimony is just such an example.
The Court’s opinion, with its abundance of scholarly reasoning, proves self-defeating. In essence, the Court simply examines Jones’s qualifications as an expert, points to *1213 his experience and opines that Jones’s experience has nothing to do with designing or evaluating the design of machinery. Supra at 1205-1206. However, design was not the central point of Jones’s testimony. Although Jones testified that he “had never seen a cylinder that size configured that way,” see App. at 167, the central thrust of his testimony concerned his observations of the fracture itself and his opinion that this caused the collapse of the lift boom.[6]
The Court also points out the deficiencies of Jones’s formal education: that he had taken no courses in metallurgy, material failure or metal fatigue, had not designed a hydraulic cylinder, and had but one year of college education with no studies in material compositions. Supra at 1204. These comments might bear on the qualification of Jones to give expert opinions under Rule 702, but they do not reach the practical experience and knowledge that qualify Jones to express a lay opinion. Compare Fed.R.Evid. 701 and Fed.R.Evid. 702.
Rule 701 does not require technical knowledge or expertise but, rather, requires that lay opinion be rationally based on the witness’s own perceptions, i.e. “the familiar requirement of first-hand knowledge or observation.” Fed.R.Evid. 701 advisory committee’s note. Jones’s opinion was based on first-hand observation of the fractured rod. From a distance of approximately 15 inches, he observed the differing colorations of the metal fracture surface and saw that the rod broke in a threaded area with a hole in it. He had ample opportunity to observe the fracture and to form his opinion.
In Teen-Ed, Inc. v. Kimball Int’l, Inc., 620 F.2d 399, 404 (3d Cir.1980), the Court observed that the essential difference between lay and expert opinion evidence is that the expert may answer hypothetical questions, whereas the lay witness may testify only from facts perceived by him, not those “made known to him at or before the hearing.” Id.; Fed.R.Evid. 703. See also In re Merritt Logan, Inc., 901 F.2d 349, 359-60 (3d Cir.1990). Jones was not asked hypothetical questions, he did not express expert opinions, and his testimony was not admitted on that basis.
When evidence is admitted under Rule 701, “cross-examination and argument will point up the weakness,” id., and the jury will weigh the lay opinion testimony in light of any countervailing evidence. Benton Harbor’s counsel scrutinized Jones’s training and experience on cross-examination and read excerpts to the jury which highlighted those issues. Jones’s lack of formal training should not prevent the admission of his opinion. See United States v. Myers, 972 F.2d 1566, 1577 (11th Cir.1992) (admitting lay opinion testimony that a stun gun caused burn marks based on the witness’s perception of the burned skin and 19 years of police experience; holding that the opinion’s lack of a technical/medical basis could be exposed on cross-examination and affected the weight, not the admissibility, of the evidence), cert. denied, — U.S. -, 113 S.Ct. 1813, 123 L.Ed.2d 445 (1993); Joy Mfg., 697 F.2d at 112 (holding that inability to state precisely why product was inoperable did not prevent lay testimony that product was inoperable but, rather, was “proper material for effective cross-examination”). Based upon Jones’s experience, the district court could properly conclude that Jones was qualified to express these opinions. Any shortcomings or weaknesses of the testimony could have been developed on cross-examination. As the district judge cogently observed, the issue was not one of possessing a sheepskin, but rather of possessing common experience. Even with flaws in reasoning, a district judge *1214 may properly conclude that “hearing the ... testimony and assessing its flaws was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence.” In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir.1994) (discussing Daubert, — U.S. -, 113 S.Ct. 2786, and the requirements for expert testimony), cert. denied, — U.S. -, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995).
The Court today appears to recognize and generally to limit the application of Rule 701 to human appearance, human conditions, and, perhaps, vehicle speed and property value. This should not be the extent of permissible lay testimony. Jones’s testimony that metal fatigue caused the fracture and the accident is more evocative and understandable than a long physical description of the rod’s outward appearance, although Jones offered both. The Court quotes the following from United States v. Yazzie, 976 F.2d 1252, 1255 (9th Cir.1992), a case which involved lay opinion on whether a rape victim appeared to be fifteen or sixteen years old:
“If it is impossible or difficult to reproduce the data observed by the witnesses, or the facts are difficult of explanation, or complex, or are of a combination of circumstances and appearances which cannot be adequately described and presented with the force and clearness as they appeared to the witness, the witness may state his impressions and opinions based upon what he observed.”
Id. at 1255 (allowing lay opinion testimony) (quoting United States v. Skeet, 665 F.2d 983, 985 (9th Cir.1982)). These general principles apply equally to Jones’s testimony. See also Eckert v. Aliquippa & S. R.R. Co., 828 F.2d 183, 185 n. 5 (3d Cir.1987) (cited with approval by the Court and allowing lay opinion testimony as to whether an accident would have occurred had the railroad cars involved coupled properly).
In determining the propriety of lay opinion, other courts have considered: (1) whether the witness has personal knowledge of the facts from which the opinion was derived; (2) whether the opinion is rationally supported, i.e. “apparent to a ‘normal person’ in [the witness’s] position;” and (3) whether the opinion is helpful to the trier of fact. Soden v. Freightliner Corp., 714 F.2d 498, 511-12 (5th Cir.1983) (citing Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 263 (5th Cir.1980)). Jones’s testimony is not unlike that at issue in Soden and meets the standards articulated by Soden.
The Court here argues that “cases like Soden stretch the doctrinal boundaries of Rule 701 opinion testimony.” Supra at 1200. The witness in Soden, Lasere, was a service manager in charge of the maintenance of trucks, and his qualifications closely parallel those of Jones.[7] Lasere testified that a step bracket located near the fuel tank caused holes in the tank and that this design was dangerous. Id. at 510-11. The Fifth Circuit stated that Lasere’s opinion was one that “may have been more properly made by one more formally an expert,” id. at 512, but that his opinion was adequately grounded in his own experience and observation. Likewise, Jones based his opinion of causation on his examination of the rod, the different coloration, and the fact that the break occurred near a drilled hole in a threaded area. The court in Soden commented that Lasere’s testimony on causation was rationally supported and “would have been apparent to a ‘normal person’ in his position.” Id. This applies equally to Jones’s opinion. The court in Soden expressed reservation only as to La-sere’s testimony that the situation was dangerous. However, this final step in Lasere’s testimony is not matched by a similar opinion of dangerousness by Jones. Thus, rather than this case exceeding the scope of Soden, Jones’s observations and opinions are squarely supported by Soden’s reasoning.
The district court reached a different conclusion on Jones’s competence to testify as a lay witness than would this Court. However, *1215 this should not be dispositive unless there is an abuse of discretion.
Professor Wigmore comments that the true theory of the opinion rule is simply to reject superfluous evidence. 7 John HenRY WigmoRE, Evidenoe § 1918, at 11 (James Chadbourn rev. 1978). Wigmore’s text quotes from Cornell v. Green, 10 S. & R. 14, 16 (Pa.1823), stating that when the facts from which the lay witness “received an impression are too evanescent in their nature to be recollected, or are too complicated to be separated and distinctly narrated, his impressions from these facts become evidence.” Id. at § 1924, at 26. Wigmore concludes that: “[w]hat is chiefly wrong is by no means the test itself, but the illiberal and quibbling application of it.” Id.
The Court states that it can find no reported ease where a lay witness testified regarding metal fatigue. However, none of the eases cited in footnote 20 of the Court’s opinion deal with the admissibility of opinion evidence.[8] Further, Salter v. Westra, 904 F.2d 1517, 1525 (11th Cir.1990) (cited by the majority in footnote 22), discusses not only expert testimony, but lay testimony of a mechanic describing the fracture surfaces of the lug bolts with the evident corrosion and rust streaks.[9]
In distinguishing Rule 701 and Rule 702 evidence, we should recognize that the expert with impressive credentials comes before a jury with an aura unmatched by most lay witnesses. We also must recognize that the jury may weigh either lay opinion testimony or expert testimony and find it wanting. In the case before us however, the district court, after a painstaking study of the deposition testimony, determined that Jones’s testimony was properly admissible as lay opinion, and that the jury should be the arbiter of its weight and value.
The district court did not abuse its discretion in admitting Jones’s testimony under Rule 701.

. In In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717 (3d Cir.1994), cert. denied, - U.S. -, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995), this Court followed Daubert v. Merrell Dow Pharmaceuticals, Inc., — U.S. -, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and rejected its substantive discussion concerning Rule 703 in In re Japanese Electronic Products. Paoli, 35 F.3d at 747-748. More significant for our purposes, Paoli continued to recognize plenary review of a district court’s interpretation of a Federal Rule of Evidence. Id. at 749.

. Carroll wrote:
"When I use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean — neither more nor less." "The question is," said Alice, "whether you can make words mean so many different things."
Lewis Carroll, The Annotated Alice: Alice's Adventures in Wonderland & Through the Looking Glass 269 (Clarkson N. Potter, New York 1960).

. ASPLUNDH’S COUNSEL: With respect to the cylinder rod portion, the broken end, what with respect to the color of the broken end did you observe?
JONES: Well, one was oxidized. The one that had been broken prior or earlier on was oxidized.
ASPLUNDH’S COUNSEL: When you say "oxidized"—
JONES: It's a different color. It's duller— more dull.
JONES: And the fresh break was simply fresh. See App. at 162.
*1211 ASPLUNDH'S COUNSEL: Can you tell me upon what you base the opinions you just gave on?
JONES: Well, I saw the rod removed from the eye. I saw where it had fatigued and broke halfway through, and then I saw where it was a fresh break. So one shows something that had been broken for a long period of time and another one breaking recently. And it broke at the thread, and it broke through the place where the pin was installed.
See App. at 160-61.

. ASPLUNDH’S COUNSEL: Why do you say that it’s your belief that [the stop blocks] have no bearing on the case?
JONES: Okay. Because the presence of those blocks, whether they're there or not there would not have stopped the breaking of — off the rod eye. They're not relevant.
ASPLUNDH’S COUNSEL: Why do you say that?
JONES: Because the rod eye broke off because of the way the end of the rod was drilled to secure a screw on the rod eye.
See App. at 159-60.

. ASPLUNDH'S COUNSEL: Okay. As fleet maintenance manager for the City of Portland, did you develop a conclusion as to why the accident occurred?
JONES: The reason that this thing broke and Sackerson was killed is because of the way the rod itself fatigued inside the rod eye. First one half and then the other half went to ultimate at the time it finally eventually broke. The reasons are two: one, the hole through the pin caused the — yeah, the rod to be weakened and, two, the threads on the eye itself — on the rod itself caused a breaking point. They were sharp, and it broke right at that point where all of those things intersected. That was the problem. There’s no doubt in my mind about it,.... App. at 160-61.

. The Court characterizes Jones’s opinion as stating that “the fracture was caused by metal fatigue and was attributable to the design of the rod end." Supra at 1194. The Court later characterizes the issue in the case as “whether it was permissible for Jones to express the opinion that the rod end had broken due to metal fatigue and that the design of the rod end was a ‘problem.’ ” Supra at 1204. The Court then determines that Jones was not qualified to express an opinion on whether the rod end was defectively designed. Supra at 1204-1205. The Court's characterization carries Jones's testimony beyond that which his spoken words will support. In substance, Jones described a fatigue fracture which occurred at the rod’s weakest point, where it was drilled through and threaded. I read Jones's testimony to express an opinion on causation, but not on defective design.

. The Court today accepts Lasere’s knowledge and qualifications but rejects those of Jones. Certainly, the fact that Lasere had eighteen years experience and Jones ten is not sufficient basis to distinguish the two. This only serves to illustrate that this determination is one of degree, properly decided by the district judge in the exercise of discretion.

. The fact that "experts have testified (and disagreed) as to whether metal fatigue could be detected,” supra at 1204, is not relevant here. None of the cases cited by the Court involving expert opinion on metal fatigue remove such testimony from the realm of lay opinion. See Fusco v. General Motors Corp., 11 F.3d 259, 261 (1st Cir.1993) (noting experts' disagreement on whether fatigue or impact caused fracture); Marrocco v. General Motors Corp., 966 F.2d 220, 225 (7th Cir.1992) (noting experts’ agreement that loss of allegedly defective component precluded evaluation of possible defects, including fatigue); Salter v. Westra, 904 F.2d 1517, 1520 (11th Cir.1990) (noting experts' disagreement as to cause of accident where their opinions "relied heavily upon the mechanic's description of the physical state of the wheels and the tire hub before he repaired them”); Grover Hill Grain Co. v. Baughman-Oster, Inc., 728 F.2d 784, 789 (6th Cir.1984) (noting expert testimony that metal fatigue caused fracture). Most tellingly, these opinions each deal with issues other than the admissibility of this evidence.

. See also Sullivan v. Rowan Companies, Inc., 952 F.2d 141, 145-46 (5th Cir.1992), where the district court ruled that a witness was not qualified to testify as an expert on metallurgy, but allowed him to testify as a lay witness under Rule 701 on his observations from microscopic examination and testing of a socket which split in half. The court did not allow the witness to opine whether the socket was defective or why it failed, but commented that a contrary decision would not necessarily have required reversal. Id. at 146.